[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-12727

_____

THOMAS DALE FERGUSON,

Petitioner-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,
ATTORNEY GENERAL, STATE OF ALABAMA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 3:09-cv-00138-CLS-JEO

_____

Before WILSON, GRANT, and LUCK, Circuit Judges.

WILSON, Circuit Judge:

Thomas Dale Ferguson is an Alabama prisoner serving a death sentence following his jury convictions on four counts of capital murder. After pursuing a direct appeal and post-conviction relief in the Alabama state courts, Ferguson filed a federal habeas petition under 28 U.S.C. § 2254. Ferguson appeals the district court's denial of his federal habeas petition, arguing that the district court did not apply the proper standard for intellectual disability as required by *Atkins v. Virginia*, 536 U.S. 304 (2002), and erred in finding Ferguson was not intellectually disabled. Ferguson also contends that the state court's determination that Ferguson's counsel was not ineffective during the pretrial and penalty phases was an unreasonable application of *Strickland v. Washington*, 466 U.S 668 (1984). After careful review and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

### A.  Guilt Phase

In 1997, an Alabama grand jury indicted Ferguson on four counts of capital murder in connection with the murder of Harold Pugh and his eleven-year-old son, Joey Pugh. *Ferguson v. State*, 814 So. 2d 925, 933 (Ala. Crim. App. 2000) (*Ferguson I*). The murder of the Pughs constituted four capital counts because the killings were committed during a robbery in the first degree (two counts); the

killings involved the murder of two or more persons by one scheme or course of conduct; and Joey was less than fourteen years old at the time of his death. *See* Ala. Code § 13A-5-40(a)(2), (10), (15) (1975).

On July 26, 1997, Ferguson and his four codefendants—Mark Moore, Michael Craig Maxwell, Donald Risley, and Kino Graham—robbed a bank in Mississippi. *Ferguson I*, 814 So. 2d at 934. Prior to robbing the bank, they went looking for a getaway vehicle at a local boat landing. *Id.* at 935. Ultimately, they decided to steal a truck belonging to Harold Pugh. *Id.* As Harold and Joey arrived at the boat landing, Maxwell ordered the Pughs back onto their boat. *Id.* After getting on the boat and heading downstream, Ferguson shot Harold and Maxwell shot Joey. *Id.* at 937. The jury found Ferguson guilty on all four counts of capital murder. *Id.* at 933.

## B. Sentencing

During the sentencing phase, Ferguson called Dr. James Chudy, a clinical psychologist who had evaluated Ferguson for the sentencing phase. Dr. Chudy testified that Ferguson was not intellectually disabled but that Ferguson's IQ was likely in the borderline range. *Id.* at 962. Further, Dr. Chudy testified that

> this borderline intelligence could possibly impair Ferguson's "reasoning in social situations"; that it could affect his ability to "reason abstractly"; and that it could "diminish to a degree" his ability to appreciate the consequences of his actions. In addition, Dr. Chudy diagnosed Ferguson as having a "personality

disorder" with borderline features.  Dr. Chudy stated that this disorder could result in mood swings that could affect Ferguson's relationships.  Dr. Chudy also stated that Ferguson may have some "transient or brief" psychotic periods where he is "out of touch with reality."  However, in his written report, Dr. Chudy stated that Ferguson's claims of psychotic episodes—i.e., hearing voices that told him to do things to other people and having hallucinations of people and objects moving—were "difficult to substantiate" and that the accuracy of those claims "remains in question."  Dr. Chudy also stated in his report that there were "no signs of disturbance in [Ferguson's] thinking"; that Ferguson was not psychotic; and that Ferguson's thinking was merely "illogical."

*Id.* at 962–63.

Ferguson also called his wife, Karen Ferguson.  She testified that they were married in November 1992, that Ferguson had a job most of the time they were married, and that Ferguson was not violent.  Karen also testified that Ferguson was mentally slow, and that she made all the decisions in their marriage, often telling Ferguson what to do.

On rebuttal, Alabama called Dr. Stephen Rosen, a clinical psychologist, who examined Ferguson before trial pursuant to a court order.  Dr. Rosen testified that Ferguson was not intellectually disabled despite his IQ score of 69, but Ferguson's IQ was likely in the borderline range.  *Id.* at 963.  Further, Dr. Rosen testified that

> Ferguson first told him that he did not do it and then said that he was an unwilling participant; by the end of the evaluation, however, Ferguson was claiming that voices had told him to commit the crime. Dr. Rosen stated that during the evaluation Ferguson attempted to give him "the impression that he was more disturbed than in fact he was" by exaggerating and claiming symptoms he believed to be signs of a mental disorder—specifically, by claiming that he heard voices and saw "little green men [who] were laughing and telling him to do things." Dr. Rosen, like Dr. Chudy, also diagnosed Ferguson as having a personality disorder and stated that the disorder could result in mood swings, antisocial traits, and perhaps some transient or temporary episodes where Ferguson is "out of touch with reality."

*Id.*

Alabama argued the existence of one aggravating circumstance: the capital offense (murders) was committed during a robbery. Ferguson argued the existence of five mitigating circumstances, including his character. Ferguson presented evidence of his character—his school records, his relationship with his father (who was actually his stepfather), and his low IQ. After hearing all the testimony and considering the evidence, the jury

6                    Opinion of the Court                    20-12727

recommended, 11 to 1, a sentence of life in prison without the possibility of parole.[1]

At sentencing, the trial judge found one statutory aggravating circumstance: the murders were committed while Ferguson was engaged in a robbery.  The trial judge found one statutory mitigating circumstance: Ferguson had no significant history of prior criminal activity. The trial judge did find the following evidence to be mitigating: (1) Ferguson's surrender and confession to authorities, and (2) the jury's recommendation of life imprisonment.  Yet when discussing the jury recommendation, the trial court found that Ferguson's age at the time of the crime (24) was not a mitigating circumstance.

Ultimately, the trial court overruled the jury's vote and sentenced Ferguson to death.  The trial judge explained:

> The Court does find that there is a reasonable basis for enhancing the jury's recommendation of life imprisonment without parole for the reasons stated herein, and this was a murder of a[n] adult man and his young son during a robbery, and [Ferguson] had the opportunity to reflect and withdraw from his actions and chose not to do so; that [Ferguson's]

---

[1] In a capital case, Alabama now requires that the jury's sentencing verdict binds the trial court and is no longer a recommendation to be overridden by the judge.  Ala. Code § 13A-5-47(a) ("Where the jury has returned a verdict of death, the court shall sentence the defendant to death.  Where a sentence of death is not returned by the jury, the court shall sentence the defendant to life imprisonment without parole.").

> capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired.

Ferguson appealed, and relevant to this appeal, he argued that the trial court erred in not finding as a nonstatutory mitigating circumstance that he was intellectually disabled. *Ferguson I*, 814 So. 2d at 965. The Alabama Court of Criminal Appeals (ACCA) noted that "the trial court did refer to the evidence of Ferguson's low intelligence in several parts of its sentencing order." *Id.* The ACCA found that the "trial court did not err in not finding, as a nonstatutory mitigating circumstance, that Ferguson was" intellectually disabled because there was no evidence in the record to support that finding. *Id.* Ultimately, the ACCA affirmed Ferguson's conviction and death sentence. *Ferguson I*, 814 So. 2d at 970.

The Supreme Court of Alabama reviewed Ferguson's petition and found that there was no error in the ACCA's opinion. *Ex parte Ferguson*, 814 So. 2d 970, 975 (Ala. 2001). The United States Supreme Court denied Ferguson's petition for a writ of certiorari. *Ferguson v. Alabama*, 535 U.S. 907 (2002).

### C. State Post-Conviction Proceedings

In March 2003, Ferguson petitioned for a writ of habeas corpus in state trial court, also called a Rule 32 petition in Alabama. Although Ferguson made several claims in his Rule 32 petition, this section only discusses the issues involved in this appeal. First, Ferguson argued that he is intellectually disabled and thus constitutionally protected from being sentenced to death under *Atkins v.*

*Virginia*, 536 U.S. 304 (2002). To support the first prong of his *Atkins* claim, Ferguson pointed to his full-scale IQ score of 71 when he was in the sixth grade and his full-scale IQ score of 69 when he was awaiting trial. Ferguson then detailed how he established at trial that he had severe limitations in adaptive functioning, including being placed in special educational programs at school.

Then, Ferguson also asserted many ineffective assistance of counsel claims, both at the pretrial and sentencing phases. For the pretrial stage, Ferguson argued that his counsel was ineffective for failing to act in his interest by providing inadequate representation during his statement to the police. Specifically, Ferguson asserted that his trial counsel failed to adequately advise him of his rights and encouraged Ferguson to talk to the police even without a plea deal. Ferguson also argued that his trial counsel failed to conduct an adequate independent investigation. To support his argument, Ferguson stated that his trial counsel had minimal contact with his family, failed to investigate the other suspects, and did not gather evidence to support his mental health defense.

For the sentencing phase, Ferguson argued that trial counsel was ineffective for failing to adequately investigate and present mitigation evidence. Relevant to this appeal, Ferguson argued that his trial counsel failed to contact and interview people who had knowledge about the abuse Ferguson suffered at the hands of his stepfather. Ferguson detailed his family history and explained how his stepfather routinely abused Ferguson's mother, Betty, and his half-brothers. Ferguson explained that witnesses would have

testified about how his stepfather beat Betty to the point that she attempted suicide, which led to her institutionalization. Ferguson argued that if his trial counsel had interviewed these witnesses, they would have been able to present a stronger, more sympathetic argument during the mitigation phase of sentencing.

In October 2006, the state trial court denied Ferguson's request for an evidentiary hearing and summarily denied his Rule 32 petition. In addressing Ferguson's *Atkins* claim, the trial court discussed Ferguson's IQ scores and how he often gave up easily on those tests, which resulted in lower scores. The trial court also stated that the expert opinions both concluded that Ferguson was not intellectually disabled. Ultimately, the trial court concluded that Ferguson's IQ was "best classified as borderline to low average intellectual functioning."

The trial court then moved on to discuss the evidence about whether Ferguson exhibited significant or substantial deficits in adaptive functioning. The trial court reviewed Ferguson's work history, including a promotion, and then discussed Ferguson's ability to develop relationships, including his marriage and his actions during and after the crime. After considering all the evidence, the trial court found that Ferguson "demonstrated a high level of adaptive functioning." Thus, the trial court found that "Ferguson does not meet either the intelligence or adaptive functioning elements necessary to establish" intellectual disability, and thus he was not intellectually disabled.

The trial court also found that Ferguson's ineffective assistance claim that his counsel should have prevented him from making inculpatory statements to police lacked merit. Specifically, the trial court found that, based on the transcript of Ferguson's confession, Ferguson initially contacted the police to give his statement, and his lawyer advised Ferguson of his right to remain silent and of the possible consequences of speaking. Next, the trial court found Ferguson's arguments that his counsel failed to conduct an adequate independent investigation to be insufficiently pleaded under Alabama Rule of Criminal Procedure 32.6(b).

Turning to Ferguson's penalty phase arguments, the trial court found that Ferguson could not demonstrate deficient performance or prejudice as required by *Strickland v. Washington*, 466 U.S. 668 (1984). Specifically, the trial court explained that "[t]rial counsel's investigation of Ferguson's case and presentation of mitigating evidence was more than reasonable in light of the circumstances of the case. The reasonableness of trial counsel's mitigation strategy is supported by the jury's 11 to 1 recommendation of life without parole." The trial court went through Ferguson's allegations about his childhood abuse and how that information was already in the record through Dr. Chudy's notes and Karen's testimony. The trial court also explained that "[e]ven if the Court assumed that the allegations in the petition are true and that counsel could have presented additional witnesses to testify regarding Ferguson's abuse as a child, . . . the evidence would be nothing more than cumulative to that already presented." The trial court also agreed with the sentencing judge who determined that Ferguson's "difficult

childhood" was not a mitigating factor.  Specifically, the trial court noted that

> Ferguson was 24 years old at the time of the crime. He had been married for five years and was able to support himself and his wife while she attended nursing school.  Under the circumstances of this case, the petitioner's allegations of child abuse and borderline intellect, even if true, would not mitigate his actions as an adult.

In April 2008, the ACCA affirmed the state trial court's decision.  *Ferguson v. State*, 13 So. 3d 418, 445 (Ala. Crim. App. 2008) (*Ferguson II*).  In regard to Ferguson's *Atkins* claim, the ACCA reviewed the record of both Ferguson's direct criminal appeal and post-conviction proceedings and then re-stated verbatim the trial court's findings from Ferguson's post-conviction proceedings.  *Id.* at 433–36.  Ultimately, the ACCA concluded that "the circuit court's findings are more than supported by the record."  *Id.* at 435–36.  The ACCA found that Ferguson was not intellectually disabled.  *Id.* at 436.

Next, the ACCA reviewed Ferguson's ineffective assistance claims.  First, as to Ferguson's claim that his counsel was ineffective during Ferguson's statements to the police, the ACCA found the trial court's dismissal of that claim proper.  The ACCA noted that the day after Ferguson's arrest, he spoke with the police alongside his counsel, Tony Glenn.  *Id.* at 437–38.  The ACCA reprinted the following exchange between Glenn and Ferguson:

12                    Opinion of the Court                    20-12727

Mr. Glenn: Dale, you called me earlier today and you told me that you wanted to try and help yourself with the Colbert County Sheriff's Department and the FBI on these charges that are here pending today. You had information you thought would help them. You realize that I have gone over with you your rights and told you that you don't have to talk, but it is your—but you have informed me that you choose to help at this point to try to help yourself; is that correct?

Mr. Ferguson: Yes, sir.

Mr. Glenn: Do you realize that there are no deals at this point?

Mr. Ferguson: Yes, sir.

Mr. Glenn: That what you are doing is voluntary and you are doing it to try to help yourself in furtherance—

Mr. Ferguson: Yes, sir.

Mr. Glenn: —of this; is that correct?

Mr. Ferguson: Yes, sir.

Mr. Glenn: And this is what you want to do?

Mr. Ferguson: Yes, sir.

Mr. Glenn: And do you realize that this is on the record, this tape that we are making here today can and will more than likely be used in court?

> Mr. Ferguson: Yes, sir.
>
> Mr. Glenn: Okay.  With that, do you want to go forward?
>
> Mr. Ferguson: Yes, sir.

*Id*. at 438.  Following this exchange, Ferguson ultimately confessed. *See id*.

In reviewing the above exchange, the ACCA noted that Ferguson himself suggested that he make the inculpatory statement to the police, not Ferguson's counsel.  *Id*.  The ACCA adopted the trial court's finding that Ferguson's statements were voluntarily made and concluded that his attorney, Glenn, could not "be held ineffective for the informed and voluntary choices of [his] client." *Id*. at 438–39.

When pursuing his clam that his trial counsel failed to conduct an adequate independent investigation, Ferguson argued that "[t]rial counsel's performance was also objectively deficient, for many reasons and including the unavailability of sufficient funds for a thorough defense." *Id*. at 439.  Then, the ACCA addressed:

> In a footnote, he then purports not to waive any claim presented in his petition or apparent from the record. However, he does not set forth any facts or argument in support of his bare contention.  Rather, he simply moves to his next ineffective-assistance allegation. Therefore, he has not complied with the requirements set forth in Rule 28(a)(10), Ala. R. App. P., as to this allegation.

*Id.*

Last, as to Ferguson's ineffective assistance claim, the ACCA again repeated the findings from the trial court and adopted them as part of the ACCA's opinion finding that summary dismissal was proper. *Id.* at 439–43.

In January 2009, the Supreme Court of Alabama denied Ferguson's petition for certiorari.

### D. Federal § 2254 Proceedings

In 2009, Ferguson filed a federal habeas petition in the Northern District of Alabama. Relevant to this appeal, Ferguson challenged the state court's failure to give him an *Atkins* hearing on his intellectual disability claim and the state court's determination on his ineffective assistance of counsel claims. The district court denied Ferguson's petition on all grounds.

Ferguson then moved to amend the judgment because, among other reasons, courts cannot rely on "pre-*Atkins* evidence to determine if a petitioner qualifies for relief under *Atkins*." The district court granted Ferguson's request and vacated the portion of its prior order regarding Ferguson's *Atkins* claim.

On August 27, 2019, the district court held an evidentiary hearing on Ferguson's *Atkins* claim and heard from two experts. Ferguson retained Dr. Robert Shaffer to evaluate his "cognitive and intellectual functions, and his adaptive behavior" to determine whether Ferguson was intellectually disabled and thus ineligible for the death penalty. Alabama retained Dr. Glen King "to primarily determine the intellectual ability of" Ferguson.

To prevail on his *Atkins* claim, Ferguson had to prove that he had significantly subaverage intellectual functioning (IQ of 70 or below), substantial deficits in adaptive behavior, and the manifestation of those problems before Ferguson reached the age of 18. *See Smith v. State*, 213 So. 3d 239, 248 (Ala. 2007). At the hearing, the district court also heard about Ferguson's prior IQ scores, received prior expert reports about Ferguson's intellectual disability, and reviewed Ferguson's school reports, which included prior IQ testing. The next paragraphs lay out in chronological order the evidence Ferguson presented to the district court to support his *Atkins* claim.

In November 1979, Ferguson obtained a full-scale IQ score of 77 on the Stanford-Binet Intelligence Scale (Binet). Before the 1985–1986 school year, Ferguson was evaluated for special education services because of a "lack of academic progress, suspected learning disability, deficient reading skills, and deficient handwriting skills." Using the Wechsler Intelligence Scale for Children-Revised (WISC-R), Ferguson achieved a verbal IQ score of 74, a performance IQ score of 71, and a full-scale IQ score of 71. The evaluator noted that Ferguson "gave up easily on both verbal and nonverbal items," and he "did not appear to be challenged by the more difficult items on the test." Using the results, the school found Ferguson was eligible for special services as "educationally mentally handicapped." Within the report, the evaluator explained that Ferguson's prior IQ score of 77 on the Binet was consistent with his current WISC-R score.

In 1988, pursuant to school policy, the school re-evaluated Ferguson, and he achieved a verbal IQ score of 87, performance IQ score of 88, and a full-scale IQ score of 87. As a result, the school moved Ferguson to normal classes, but he received special assistance such as receiving help with certain subjects, having more time to take a test, or having someone read the test to him.

In December 1997, Dr. Rosen administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R), and Ferguson achieved a verbal IQ score of 76, a performance IQ score of 66, and a full-scale IQ score of 69. But Dr. Rosen noted that it was "quite apparent that [Ferguson] did not make a good effort in this test, giving up readily on many items and seemingly not trying as hard as possible." At Ferguson's criminal trial, Dr. Rosen expounded on Ferguson's lack of effort by noting that Ferguson's assessment revealed a "somewhat inconsistent pattern" where he would get the earlier, simpler questions wrong but would then get later, harder questions right. Dr. Rosen testified that he did not see any signs of intellectual disability, but that Ferguson's intellectual abilities were below average—in the borderline intellectual functioning range with an IQ between 70 and 84. Dr. Rosen testified that if Ferguson had "really tried [then] he would have scored probably in the middle 70's for most of them, perhaps higher."

In June 1998, after conducting a psychological evaluation, Dr. Chudy did not provide a specific IQ score but noted that the Shipley Institute of Living Scale placed Ferguson in the borderline intellectual range at about the fifth percentile. Dr. Chudy also

20-12727                 Opinion of the Court                 17

testified that borderline intellectual functioning covers "the area be-tween low average intelligence and" intellectual disability.

In preparation for the evidentiary hearing, between September 2017 and March 2018, Dr. Shaffer met with Ferguson and interviewed Ferguson's mother, Betty. Dr. Shaffer administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), and Ferguson received a full-scale IQ score of 77. But after applying the Flynn Effect[2] and the standard error of measurement (SEM),[3] Dr. Shaffer explained that Ferguson's IQ fell between 69.4 and 78.4 with 95% probability, or between 67.9 and 78.9 with a confidence level of 99%. Dr. Shaffer determined that the totality of the test scores aligned with his opinion that Ferguson has significant limitations in his ability to function intellectually, despite some tests not showing substantial impairments. As for adaptive functioning, Dr. Shaffer administered the Vineland Adaptive Behavior Scales Test

---

[2] The Flynn Effect refers to findings by Dr. James Flynn that average IQ scores have increased steadily by roughly .3 points every year since the IQ test was normed. Thus, when applying the Flynn Effect, the evaluator looks at when the test was normed (approximately mid-2007 for the Wechsler Fourth Edition) and when the test was administered (September 2017), then determines the difference (here 10.2 years), and subsequently multiplies it by .3 (the annual increase) to get a set number (3.06), which is subtracted from the full-scale IQ score (77). So Ferguson's September 2017 full-scale score of 77 would be reduced by 3.06 points to 73.94 if adjusted for the Flynn Effect.

[3] The SEM typically involves a range from five below to five above the set IQ. This provides a range for the IQ score, which likely gives a better estimate than a fixed number for the person's IQ.

(Vineland)[4] to Betty Ferguson because she could provide observations of Ferguson at the age of 18. Considering Betty's responses about Ferguson at the age of 18, Ferguson's Vineland scores showed 67 in communication, 67 in daily living skills, and 68 in socialization, giving him a composite score of 63. This placed him in the first percentile, meaning that 99 percent of comparable eighteen-year-olds had greater skills and abilities to perform daily routines than Ferguson did at the age of 18. Dr. Shaffer concluded that those findings justified an intellectual disability diagnosis.

In February 2018, Dr. King evaluated Ferguson and administered the WAIS-IV and the Stanford-Binet Intelligence Test, Fifth Edition (SB-5). Ferguson received a score of 85 on the WAIS-IV and a score of 84 on the SB-5. Dr. King adjusted Ferguson's score on the WAIS-IV using the SEM, providing a range of 81 to 89. Dr. King administered the Adaptive Behavior Assessment System where Ferguson rated his own abilities on whether he could perform several tasks. Ferguson highly rated his ability to complete the identified tasks. Dr. King also administered the Independent Living Scales, which measures practical abilities of managing money, health and safety, social adjustment, and problem solving. Dr. King testified about Ferguson's performance on the test and noted his belief that Ferguson did not have subaverage intellectual functioning and that

---

[4] The Vineland looks at three domains of adaptive behavior: communication skills, daily living skills, and social skills. Typically, the Vineland is administered to parents, caregivers, or teachers rather than the person whose IQ is at issue.

20-12727                Opinion of the Court                    19

there was no indication of poor adaptive functioning (only lower social adjustment which is expected from being on death row).

After the evidentiary hearing, the district court denied Ferguson's request for relief, concluding that Ferguson failed to establish by a preponderance of the evidence that he has an intellectual disability. The district court gathered and identified all of Ferguson's IQ scores, as detailed below:[5]

| Test Date | IQ Test Given | Full Scale Score | Flynn Effect Adjustment | SEM Range |
|---|---|---|---|---|
| 1979 | SB-3 | 77 | 75.2 | 70.2–80.2 |
| 1985 | WISC-R | 71 | 67.7 | 62.7–72.7 |
| 1988 | WISC-R | 87 | 82.2 | 77.2–87.2 |
| 1997 | WAIS-R | 69 | 64.2 | 59.2–69.2 |
| 2017 | WAIS-IV | 77 | 74.3 | 69.3–79.3 |
| 2018 | WAIS-IV | 78 | 75.15 | 70.15–80.15 |
|  | SB-5 | 84 | 79.6 | 74.6–84.6 |

---

[5] This chart comes from the district court's order but does not contain the column listing when the IQ tests were normed, nor does it contain the corresponding footnotes. We have also adjusted the 2018 SB-5 score to correct an error recognized by the district court in a subsequent order—the court initially reduced the SB-5 score for "practice effect," but later acknowledged that the practice-effect reduction applied only to the 2018 WAIS-IV score. Of note, the district court correctly identified the years the tests were normed but still made mathematical errors when calculating the Flynn Effect. *See supra* n. 2. Ferguson does not argue these errors nor do they make a difference in our ultimate decision. Thus, we use the calculation provided by the district court.

The district court reduced the 2018 WAIS-IV IQ score by 7 points for practice effect[6] because Dr. King re-administered the same test Dr. Shaffer administered five months earlier.

Considering his evaluators also noted that Ferguson did not try on some of his IQ tests (specifically the ones where he scored below 70), the district court found that Ferguson did not suffer from "*significantly* subaverage intellectual functioning." As for adaptive behavior, the district court found that Ferguson failed to show "substantial *present* limitations" in adaptive functioning and that most of the evidence produced focused on the time before and during Ferguson's trial. The district court did not address whether his IQ scores and deficits in adaptive functioning manifested before Ferguson reached 18-years-old.

Ferguson timely appealed the district court's denial of habeas relief. First, Ferguson argues that the district court clearly erred in finding that he was not intellectually disabled. Second, Ferguson argues that his trial counsel was ineffective at multiple stages of his case and thus the ACCA's decision is an unreasonable application of *Strickland*. We will address each argument in turn.

---

[6] In citing a 2012 study, the district court explained that when "the WAIS-IV was re-administered at three or six months after the initial, baseline administration of that test[, the study] found that their Full-Scale IQ score increased an average of 7 points."

## II.    INTELLECTUAL DISABILITY CLAIM

Ferguson argues that the district court erred in two ways concerning his *Atkins* claim.[7]  First, Ferguson argues that the district court erred in requiring him to show that he *presently* suffered from substantial deficits in adaptive functioning at the time of his *Atkins* hearing, which occurred over twenty years after the crime. Second, regardless of the standard, Ferguson argues that the district court clearly erred in finding him not intellectually disabled.

"A determination as to whether a person is [intellectually disabled] is a finding of fact." *Fults v. GDCP Warden*, 764 F.3d 1311, 1319 (11th Cir. 2014).  "We review for clear error a district court's finding that an individual is not intellectually disabled." *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 632 (11th Cir. 2016).  "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire

---

[7] In its order granting Ferguson's motion to alter or amend the judgment as to his *Atkins* claim, the district court, citing *Burgess v. Commissioner, Alabama Department of Corrections*, 723 F.3d 1308, 1317 (11th Cir. 2013), agreed with Ferguson's argument that it was an unreasonable application of *Atkins* to consider potential mitigation information produced before the *Atkins* decision to determine whether Ferguson is intellectually disabled.  Not until oral argument when this court asked Alabama whether the district court erred in having an evidentiary hearing did Alabama contest the district court's order setting and conducting an evidentiary hearing.  But Alabama's argument in response was conclusory at best.  Here, we make no determination about whether the district court erred in holding an evidentiary hearing and reviewing Ferguson's *Atkins* claim de novo, and we will only review the district court's finding that Ferguson is not intellectually disabled.

evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In *Atkins*, the Supreme Court held that the execution of intellectually disabled people violates the Eighth Amendment, leaving to the individual states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U.S. at 317. But the Supreme Court noted that "clinical definitions of [intellectual disability] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills" that manifested before the age of 18. *Id.* at 318.

In *Ex Parte Perkins*, the Supreme Court of Alabama discussed the Supreme Court's decision in *Atkins* and how the broadest definition of intellectual disability requires the prisoner to prove: (1) significantly subaverage intellectual functioning (IQ below 70), (2) significant deficits in adaptive functioning, *and* (3) that both issues manifested before the age of 18. 851 So. 2d 453, 456 (Ala. 2002). Later in *Smith*, Alabama formally adopted the broadest definition and requires that "in order for an offender to be considered [intellectually disabled] in the *Atkins* context, the offender must currently exhibit subaverage intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18." 213 So. 3d at 248.

Turning to Ferguson's arguments, he contends that by requiring a showing of *present* deficits in adaptive functioning,

Alabama's standard for determining intellectual disability conflicts with *Atkins* and is thus unconstitutional. Regardless of the validity of Alabama's requirement that Ferguson must demonstrate substantial *present* limitations in adaptive functioning, under *Smith*, Ferguson also has to show he possessed significantly subaverage intellectual functioning. Because the district court found Ferguson at no point had subaverage intellectual functioning, and because Ferguson has not shown the district court clearly erred in making that finding, we need not address whether requiring *present* significant deficits in adaptive functioning runs afoul of *Atkins*.

We now turn to Ferguson's argument about his intellectual functioning. Specifically, Ferguson argues that when considering all his IQ scores, including when adjusted for the Flynn Effect and after the SEM has been applied, he has significantly subaverage intellectual functioning. We disagree.

After reviewing all the evidence, the district court found that when adjusted for the Flynn Effect, all but two of Ferguson's IQ scores were above 70, the rough cutoff for intellectual disability. The two IQ scores below 70 were the 1985 IQ test (score of 67.7) and the 1997 IQ test (score of 64.2). The district court discounted those two scores based on evidence that Ferguson did not put forth his best effort on those tests. Because we have held that the trier of fact can discount IQ scores when there is evidence of malingering, *Clemons v. Comm'r, Alabama Department of Corrections*, 967 F.3d

1231, 1248 (11th Cir. 2020),[8] we cannot say that the district court's factual finding about Ferguson's IQ scores is clearly erroneous.

Ferguson asserts that we should find the district court clearly erred in discounting the two sub-70 scores because the remaining tests, including the most recent ones, showed that Ferguson put in the appropriate effort. Ferguson's argument misses the mark. Ferguson wants us to require the district court to impute his legitimate effort expended on later tests to all of his tests. This would be an error—just like it would have been an error had the district court imputed the malingering accusations onto all of Ferguson's IQ scores. Rather, the district court properly reviewed each IQ score and any notes from the corresponding evaluator to weigh whether to credit those scores. Both challenged tests included notations from the evaluators about Ferguson's lack of effort, and the district court weighed those records, including Dr. Rosen's credentials, to determine whether he could have reasonably arrived at his conclusion. *See Clemons*, 967 F.3d at 1248. We find that the district court took the correct approach, and the record supports its finding.

---

[8] Although *Clemons* involved reviewing the petitioner's *Atkins* claim through the lens of the Antiterrorism and Effective Death Penalty Act of 1996, we see no reason why a district court, sitting as the trier of fact, should not be allowed to discount IQ scores when there is evidence of malingering.

After the SEM is applied, only one other test has a range that falls below 70: the 2017 IQ test.[9]  But, importantly, the SEM "is merely a factor to consider when assessing an individual's intellectual functioning—one that may benefit or hurt that individual's *Atkins* claim, depending on the content and quality of expert testimony presented." *Ledford*, 818 F.3d at 640–41.

We find that the district court committed no clear error in its consideration of those IQ scores and the SEM range associated with those scores.  Ferguson's 2017 IQ score of 77 would yield a SEM IQ range (after being adjusted for the Flynn Effect) of 69.3–79.3.[10]  The other four scores considered by the district court ranged from just above 70 at the low end of the SEM range to 87.2 at the high end.  The experts disagreed as to whether Ferguson's intellectual functioning may be higher or lower than his overall IQ score reflected.  For example, the trial experts—one appointed by the court and one called by Ferguson—testified that Ferguson's

---

[9] Although the 1985 and 1997 IQ scores would produce a range below 70, we need not address the SEM range for those tests because we found that the district court properly discredited those IQ scores based on malingering.

[10] The district court, as we explained earlier, discounted Ferguson's IQ scores based on the Flynn Effect and (as to the 2018 WAIS-IV score) the practice effect.  For clarity, we repeat what we've said in other cases:  while a factfinder *may* consider both effects in assessing an offender's possible intellectual disability (if there's evidence to support them), it is *not required* to consider them. *See Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1276 (11th Cir. 2020); *Raulerson v. Warden*, 928 F.3d 987, 1008 (11th Cir. 2019); *Ledford*, 818 F.3d at 638–39.

intellectual functioning was above the disabled range. Twenty years later, at the evidentiary hearing, Dr. Shaffer explained there was a 95% probability that Ferguson's full scale IQ score was between 69.4–78.4. As a result, Dr. Shaffer found that Ferguson had significantly subaverage intellectual functioning because his IQ could be less than 70. But Dr. King testified that, considering Ferguson's IQ scores and the SEM ranges, Ferguson's IQ placed him at either the high end of the borderline range (70–84) or at the low end of the average range (85–115). In ultimately concluding that Ferguson had not shown significantly subaverage intellectual functioning, the district court credited Dr. King's testimony over Dr. Shaffer, which is plausible in light of the record. *See Ledford*, 818 F.3d at 641 ("So long as the district court's findings regarding how the standard error of measurement informs its ultimate intellectual functioning determination are plausible in light of the record evidence viewed in its entirety, there will be no clear error.").

⋆        ⋆        ⋆

Because the district court's finding that Ferguson is not intellectually disabled is plausible in light of the entire record, it is not clearly erroneous. *See Anderson,* 470 U.S. at 573–74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). We therefore affirm the district court on this point.

### III.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Ferguson argues that his trial counsel was ineffective during both the pretrial and sentencing stages of his case. The ACCA denied Ferguson's ineffective assistance of counsel claims, so our review is subject to the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2554 (AEDPA). *See Lynch v. Sec'y, Fla. Dep't of Corr.*, 776 F.3d 1209, 1217 (11th Cir. 2015).

Under AEDPA, a federal court can grant relief to a state prisoner *only* if he shows that the state court's determination of his claim resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

Here, Ferguson argues that the ACCA's decision is an unreasonable application of *Strickland v. Washington*, 466 U.S 668 (1984). Thus, we will only review whether the ACCA unreasonably applied *Strickland* under § 2254(d)(1).

A state habeas court's decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling . . . was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (internal quotation marks omitted).

To succeed on an ineffective assistance of counsel claim, a criminal defendant must show: (1) that his lawyer rendered deficient performance, such that he "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," and (2) that those errors prejudiced the defense, such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. As the Supreme Court described it, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

As to deficient performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (alteration adopted and internal quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but, importantly, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. "In other words,

counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

As noted above, to establish prejudice, the defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case"; he need only show a reasonable probability of a different outcome, which requires a showing "sufficient to undermine confidence in the outcome." *Id.* at 693–94. A court deciding an ineffectiveness claim need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

Ferguson argues that his trial counsel erred at both the pre-sentencing phase and the penalty phase. We will address each phase, and Ferguson's arguments under each, in turn.

### A.    Pre-Sentencing Phase

Ferguson argues that his trial counsel erred in two ways during the pre-sentencing phase. First, Ferguson's trial counsel was ineffective for not acting in Ferguson's best interest during Ferguson's statement to law enforcement. Second, Ferguson's trial counsel was ineffective for failing to conduct an adequate pretrial investigation into Ferguson's mental health evidence and possible intellectual disabilities for the guilt phase.

#### i.    *Confession*

Ferguson argues that, for two reasons, his trial counsel was ineffective at the time he gave his statements to law enforcement,

and that, as a result, he was prejudiced to an extent sufficient to warrant relief under *Strickland*.

First, Ferguson argues that his trial counsel was deficient for letting him speak with law enforcement shortly after his arrest. As discussed above and as the ACCA noted, Ferguson called his counsel, Glenn, to set up a time for Ferguson to give a statement to police. Then Glenn explained that there was no deal on the table and that any statements made would be used against Ferguson. As the ACCA noted, Ferguson conveyed that he understood his rights and wanted to move forward with the statement.

Ferguson has failed to show how the ACCA unreasonably applied *Strickland*. Ferguson attempts to argue that his attorney should have instructed him to remain silent absent a deal. But as the ACCA noted, Ferguson requested the meeting where Glenn appeared at the confession with Ferguson and explained Ferguson's rights to him. Glenn then explained that there were no deals on the table and that Ferguson's statements would likely be used in court—important information to help Ferguson decide whether to move forward with speaking to the police.  As the ACCA noted, and confirmed by the transcripts, Ferguson understood those rights and still made the decision to proceed after speaking with Glenn. *Ferguson II*, 13 So. 3d at 438.

Ferguson argues that an attorney renders ineffective assistance when, without doing proper due diligence, counsel fails to properly advise their client of their right to remain silent or move to suppress an improper confession. Specifically, Ferguson points

20-12727                 Opinion of the Court                 31

to two cases in which this court has found counsel to be ineffective for failing to suppress a confession. *See Smith v. Wainwright*, 777 F.2d 609, 616–20 (11th Cir. 1985) (*Smith I*); *Smith v. Dugger*, 911 F.2d 494, 497–98 (11th Cir. 1990) (*Smith II*). But Ferguson's reliance is misplaced. Both cases involved the same defendant making confessions *without* counsel present, and counsel subsequently failing to move to suppress the illegally coerced information. *See Smith I*, 777 F.2d at 610, 618; *Smith II*, 911 F.2d at 495–96, 498. Here, Glenn was present during the confession and properly informed Ferguson of his rights. In fact, Ferguson contacted Glenn to make the voluntary choice to speak with police, which was reaffirmed by Ferguson after hearing his rights. By informing Ferguson of his rights and the likelihood that his confession would be used against him, Glenn was sufficiently "functioning as the 'counsel' guaranteed [to Ferguson] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Thus, the ACCA's determination that Glenn "cannot be held ineffective for the informed and voluntary choices" of his client is not an unreasonable application of *Strickland*. *Ferguson II*, 13 So. 3d at 439.

Second, Ferguson argues that his counsel was deficient for failing to step in when law enforcement allegedly pressured him to change his story. But Ferguson did not fairly present this argument to the district court in his habeas petition.[11] *See Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1352 (11th Cir. 2009) (noting that an

---

[11] We note that Ferguson did raise this issue (although in a conclusory manner) in his state habeas petitions, despite the Commissioner's arguments to the contrary.

argument that is not fairly presented to the district court will not be considered on appeal). In his counseled federal habeas petition, Ferguson never mentions the alleged pressure from law enforcement but mainly argues that Glenn "failed to counsel adequately and represent vigorously his client's interest . . . during Mr. Ferguson's alleged 'confession' on August 12, 1997." Ferguson's attorneys did not expressly designate the issue as a distinct claim for relief, nor did they specifically argue that the ACCA unreasonably applied *Strickland*. Thus, we will not consider Ferguson's argument on whether his counsel was deficient for not intervening during Ferguson's confession when police allegedly pressured him to change his story.

Because Ferguson has failed to show that his counsel was deficient in how he handled Ferguson's confession, we need not address his prejudice argument. *See Strickland*, 466 U.S. at 697 (explaining that a court considering an ineffectiveness claim need not "address both components of the inquiry if the defendant makes an insufficient showing on one"); *see also Conner v. GDCP Warden*, 784 F.3d 752, 766–67 (11th Cir. 2015) (following *Strickland* and only addressing one prong because it disposed of the petitioner's claim).

ii.        *Adequate Investigation*

Ferguson next argues that his counsel was ineffective for failing to conduct an adequate investigation into his mental health evidence and possible intellectual disabilities before trial. But as the Commissioner correctly argues, and the district court correctly

20-12727                    Opinion of the Court                    33

noted, Ferguson abandoned this claim during his state post-conviction proceedings and thus it is procedurally defaulted.

Ferguson's inadequate investigation claim was procedurally defaulted under Alabama's procedural rules. The ACCA noted that Ferguson argued that "[t]rial counsel's performance was also objectively deficient, for many reasons and including the unavailability of sufficient funds for a thorough defense." *See Ferguson II*, 13 So. 3d at 439. But the ACCA explained that the conclusory statement without facts or argument did not comply "with the requirements set forth in Rule 28(a)(10)" of the Alabama Rules of Appellate Procedure. *Id.*

"Claims presented in a Rule 32 petition but not pursued on appeal are deemed to be abandoned." *Hallford v. Culliver*, 459 F.3d 1193, 1199 n.4 (11th Cir. 2006) (per curiam) (quoting *Boyd v. State*, 913 So. 2d 1113, 1145 (Ala. Crim. App. 2003)). "[W]hen a petitioner has failed to present a claim to the state courts and under state procedural rules the claim has become procedurally defaulted, the claim will be considered procedurally defaulted in federal court." *See Collier v. Jones*, 910 F.2d 770, 772 (11th Cir. 1990). Thus, Ferguson's claim about an inadequate pretrial investigation is procedurally defaulted.[12]

---

[12] Nestled inside the inadequate-pretrial-investigation section of Ferguson's brief, he also argues that trial counsel: "failed to present a defense that included evidence regarding [Ferguson's] disabilities"; "failed to introduce evidence regarding [his] intoxication and drug use"; and "failed to . . . present testimony

\*    \*    \*

Ferguson has not demonstrated, under AEDPA, that the ACCA's denial of his ineffective assistance of counsel claim about his counsel's actions before his confession was an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). Also, Ferguson's argument about his counsel's pretrial investigation for the guilt phase is procedurally defaulted. Thus, Ferguson has not met his burden to warrant habeas relief on his pre-sentencing stage claims of ineffective assistance of counsel.

## B.    Penalty Phase

Last, Ferguson argues that his counsel was ineffective by failing to investigate and present evidence of Ferguson's stepfather's abuse during the penalty phase. Specifically, Ferguson argues that the ACCA's determination that Ferguson was not prejudiced because of that deficient performance was an unreasonable application of *Strickland*.[13] Here, we need not address whether Ferguson's

about [his] personality and tendencies." But these are guilt-phase arguments—not pretrial investigation claims—and, thus, they are outside the certificate of appealability. *See McClain v. Hall*, 552 F.3d 1245, 1254 (11th Cir. 2008) ("In an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the certificate of appealability." (alterations adopted)). Even if they weren't, as the district court explained, Ferguson's guilt-phase arguments were procedurally defaulted because he did not raise them in the ACCA and he has not given us any reason to excuse the default.

[13] Ferguson also maintains that the district court correctly concluded that his counsel's performance was deficient and that the ACCA's determination to the opposite was an unreasonable application of *Strickland*.

counsel performance was deficient because the ACCA's determination that Ferguson failed to establish prejudice was not an unreasonable application of *Strickland*.

The ACCA adopted the trial court's finding about prejudice, specifically noting:

> Finally, in light of the nature and circumstances of this crime—the robbery and murder of a father and his young son—and the specific findings made by the sentencing authority, there is no reasonable probability that the mitigating circumstances alleged in the petition, even if true, would have altered the balance of aggravating and mitigating factors in this case. The sentencing authority was well aware of the mitigation evidence presented at trial.

*Ferguson II*, 13 So. 3d at 442 (internal citation omitted).

Under the prejudice prong, when the defendant challenges his death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. In determining whether there is a reasonable probability of a different result, a court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweigh it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S.

30, 41 (2009) (per curiam) (alteration adopted) (quoting *Williams*, 529 U.S. at 397–98).

The ACCA found that Ferguson's "trial counsel presented the vast majority of mitigation evidence that Ferguson alleges should have been presented." *Ferguson II*, 13 So. 3d at 439. We agree with the ACCA that most of the new mitigation evidence was cumulative of the nonstatutory mitigating circumstances presented during sentencing. *See Boyd v. Allen*, 592 F.3d 1274, 1298 (11th Cir. 2010) ("[M]uch (although not all) of the 'new' testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial and incorporated into the sentencing judge's decision to override the jury."); *Marquard v. Sec'y for the Dep't of Corr.,* 429 F.3d 1278, 1308 (11th Cir. 2005) ("There is no reason to believe that added details about Marquard's troubled childhood and substance abuse—which the sentencing court clearly recognized in imposing a death sentence—would have had any effect on the sentence.").

While more mitigation witnesses could have presented more details or different examples of these unfortunate aspects of Ferguson's life, these aspects were nonetheless known to the sentencing jury and judge. Thus, no significant prejudice can result from the exclusion of cumulative evidence, meaning Ferguson's trial counsel's failure to present cumulative evidence was not prejudicial. *See Cullen*, 563 U.S. at 200 ("There is no reasonable probability that the additional evidence Pinholster presented in his state habeas proceedings would have changed the jury's verdict. The

'new' evidence largely duplicated the mitigation evidence at trial."); *see also Ledford*, 818 F.3d at 649–50.  Because there is not a "reasonable probability" that, but for the exclusion of cumulative evidence, the last remaining juror would have voted for life imprisonment or the judge would have decided not to override the jury, we cannot find that the ACCA's determination that Ferguson failed to show prejudice was an unreasonable application of *Strickland*.

Citing *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008), Ferguson argues that prejudice is evident in his case because, like *Williams*, the trial judge overrode the jury's recommendation for life imprisonment based on one statutory factor.  Specifically, as Ferguson points out, *Williams* stated "[t]he fact that the jury decisively voted against the death penalty, even without the powerful evidence adduced at postconviction, weighs heavily in favor of a finding of prejudice."  542 F.3d at 1343.  The state responds by citing *Lee v. Commissioner, Alabama Department of Corrections*, where we said that "the fact that the jury recommended life imprisonment counsels against a determination that [the petitioner] was prejudiced under *Strickland*."  726 F.3d 1172, 1196 (11th Cir. 2013) (citing *Parker v. Allen*, 565 F.3d 1258 (11th Cir. 2009)).

Whatever tension there may be between *Williams* and *Lee*, we don't have to resolve it here because, in order to show the ACCA unreasonably applied *Strickland*, Ferguson must "show that there is a reasonable probability that, but for counsel's unprofessional errors," the trial judge would not have overridden the jury's recommendation of life imprisonment.  *See* 466 U.S. at 694.  Here, the

ACCA assumed all of Ferguson's allegations from his Rule 32 petition to be true, but even with that assumption, the ACCA found that there was no reasonable probability that it would have altered the balance of the aggravating and mitigating evidence. As the ACCA noted, the trial judge "was well aware of the mitigation evidence presented at trial" yet found that the circumstances of Ferguson's childhood did not amount to a mitigating factor given Ferguson's age, marriage, and employment. *Ferguson II*, 13 So. 3d at 442. In light of the trial court's determination, we cannot find the ACCA unreasonably applied *Strickland* by concluding that Ferguson did not provide enough evidence to undermine the ACCA's confidence in the trial judge's decision to override the jury's recommendation of life. Ferguson "cannot show that 'no fairminded jurist' would have done as the state habeas court did in denying his claim." *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1359 (11th Cir. 2020).

## IV.    CONCLUSION

After careful review, we find that the district court did not clearly err in finding that Ferguson was not intellectually disabled. We also find that the ACCA's determination that Ferguson's counsel was not ineffective was not an unreasonable application of *Strickland*. Thus, we affirm the district court's denial of Ferguson's habeas petition.

**AFFIRMED.**